***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments on appeal. The Full Commission adopts and affirms the Deputy Commissioner's holding with some minor modifications and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in the Pre-Trial Agreement and at the hearing on 28 May 2003 as:
 STIPULATIONS
1. That all the parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. That the employer-employee relationship existed between the defendant-employer and the plaintiff-employee at all relevant times herein.
3. That defendant-employer is self-insured, and that Key Risk Management Services, Inc. is the servicing agent.
4. That plaintiff's average weekly wage at all relevant times herein was $651.35.
5. That the issues to be determined from this hearing are as follows:
a. Whether plaintiff suffered an injury by accident arising out of and in the course and scope of his employment with employer on February 26, 2002?
b. If so, to what benefits, if any, is he entitled to receive?
The Pre-Trial Agreement along with its attachments and any stipulations that have been submitted by the parties are hereby incorporated by reference as though they were fully setout herein.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner plaintiff was a 53 year-old male. His date of birth is January 3, 1950.
2. Plaintiff had been working for defendant-employer for about eight and a half years at the time of the incident in February 2002. He was a patrol and training officer. He had previously served in United States Army for 25 years and retired as a sergeant. At the time of the incident plaintiff was 5'8" and weighed 198 pounds.
3. On February 26, 2002 at about 2:20 a.m., while plaintiff was sitting in his car after issuing a citation to an individual, he was approached by a young lady who said that her mother, who was in the car with her, had stopped breathing.
4. In response to the young lady, plaintiff and the trainee with him got out of the car they were sitting in, and went to assist the woman who had stopped breathing. When plaintiff asked her if she was all right there was no response. Plaintiff checked for vital signs by checking her neck area and her wrist, and did not get any indication of a pulse.
5. Plaintiff told Officer Tunjui Quiett, the trainee with him, to get the kit out of the car that included the mouth mask for administering CPR. The woman who had stopped breathing was on the front seat passenger side of the vehicle leaning toward the steering wheel when plaintiff first approached the vehicle, with her eyes rolled back in her head.
6. After giving some direction to some other officers who had arrived at the scene, plaintiff began CPR by compressing her chest. Officer Quiett was operating the breathing apparatus that included breathing into the lady's mouth. Plaintiff would do five compressions and then wait for Officer Quiett to breathe into the lady's mouth. Somewhere between the 21st and 22nd repetition plaintiff felt pain in his head as if he had been hit in the head. Thereafter, he did one or two more series of compressions at which point he asked Officer Mead to take over the compressions. When plaintiff initiated CPR the victim was still in the front seat of the car.
7. At some point after Officer Mead took over the compressions, the victim was removed from the front seat of her car to the outside of the car. After Officer Mead took over the compressions of CPR, plaintiff returned to his vehicle where he sat until the EMS cleared the scene. Plaintiff commented to Officer Shackelford in a joking manner, "Why did you hit me?" All the other officers at the scene noted that plaintiff began to complain about a headache and all the officers noted that there was change in plaintiff's disposition, both physically and mentally. The longer plaintiff was into the CPR the more out of breath and drained he was. Ms. Smith stated you could tell by the tone of his voice it was taking a lot out of him. Plaintiff and other officers testified he was exhausted after doing the CPR. Dr. Jaufmann testified after doing 20 chest compression repetitions this man would be physically tired and exhausted.
8. Plaintiff, Officer Mead and Wanda Smith the dispatcher testified CPR is seldom done by deputy sheriffs. Although they are trained in CPR, deputies are rarely first responders to medical emergencies. This was the first time plaintiff had done CPR in his 8 ½ years on the force and dispatcher Smith had not had any officer on the Sheriff's department doing CPR in her eight years as a dispatcher with the Department.
9. After leaving the scene, plaintiff proceeded to the hospital where he continued to do paperwork for this incident. While there plaintiff complained of headaches that he described as the worst headaches he had ever experienced, and as "the headache from hell."
10. Plaintiff typically worked a 12-hour shift, but he was unable to complete his shift due to the headache and called his supervisor with this information. Plaintiff was given some medication by a nurse on duty at the hospital. After leaving the hospital he experienced three episodes of throwing up. He thought that he had eaten something that had caused this. By the time he got home he noted that he was becoming disoriented and he went to bed. During the day he took some more over-the-counter medication, either Tylenol or Motrin. When plaintiff had arrived home that morning his wife had not left for work and asked what was wrong, and plaintiff explained to her what had happened. Plaintiff's wife checked on him about 6:00 or 6:30 p.m. and plaintiff told her that his head was still hurting. Plaintiff ate when she returned home. Shortly thereafter he threw up, at which point she decided to take him to the hospital.
11. Plaintiff's wife took him to Cape Fear Valley Medical Center. Approximately one half hour after getting there, the nurse and/or the doctor told plaintiff's wife, that plaintiff had experienced a brain aneurysm and that at that time it was still bleeding. Before surgery could be attempted they would attempt to stop the bleeding. That was done, and the first procedure which was less invasive was unsuccessful, therefore the doctors had to utilize a more invasive route to correct the aneurysm or to seal it. Plaintiff was operated on March 1, 2002 by Dr. Bruce P. Jaufmann, M.D. a neurosurgeon. Dr. Jaufmann did a craniotomy with clipping of the aneurysm. Thereafter, plaintiff was hospitalized until some time in April.
12. In June 2002, plaintiff was released with restrictions to return to work on a limited basis. Plaintiff initially returned to work working three hours per day, and in October 2002 was released to return to six hours per day. During this period of time plaintiff's treating physician had not released him and did not think that he would be able to return back to work at full duty, or he would not know whether plaintiff would be able to return back to work at full duty until approximately a year later.
13. Given the situation plaintiff explored all of his options including medical disability retirement. For him to do so and to find out what his disability benefits would be, he would have to in fact make an application, which he did. As a result plaintiff gave two notices of retirement, the first one was in the winter or fall of 2002 and the second one was dated on or about "February 5, 2003" indicating that his last day of work would be February 28, 2003. These documents were submitted to the employer. At the time these documents were submitted, plaintiff had not been advised as to what benefits he was entitled to from the medical disability retirement, nor had plaintiff been released by his doctors to return back to full duty. Plaintiff submitted these documents only to explore his potential benefits. After submission of these documents plaintiff was advised of the amount of his monthly disability benefits, at which point he advised defendant-employer that he would return to work. In this approximate time frame his doctors advised plaintiff that he could return to work.
14. Plaintiff suffered a subarachnoid hemorrhage (rupture) of an anterior communicating artery aneurysm as a result of doing CPR on a woman who had a cardiac arrest on February 26, 2002. An aneurysm is a weakening in the wall of the blood vessel and over time the aneurysm gradually enlarges. The risk of an aneurysm rupture in an individual who has known aneurysm that is not ruptured is about one percent per year.
15. The physical exertion and stress of giving CPR to the victim who was in cardiac arrest and had no pulse caused plaintiff's blood pressure to increase and caused the aneurysm to rupture. This finding of causation is based on the opinion of Dr. Bruce P. Jaufmann, M.D., a neurosurgeon. On the issue of causation there was disagreement from the testifying physicians. The undersigned finds significant weight in the opinion of Dr. Jaufmann because: 1. He was the treating physician with first hand knowledge of Deputy Ferreyra's condition and treatment. 2. Dr. Jaufmann's education and training and expertise as neurosurgeon dealing with matters of the brain and central nervous system. 3. Dr. Jaufmann has done CPR and has first-hand knowledge of CPR and was familiar with the physical exertion and mental stress associated with its use.
16. Plaintiff was unable to work from February 26, 2002 to June 2002.
17. From June 2002 until February 28, 2003 plaintiff was only able to work part-time.
18. Plaintiff has been unable to work from February 28, 2003 and continuing.
19. Based on an average weekly wage of $651.35 plaintiff's compensation rate is $429.89.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The subarachnoid hemorrhage (rupture) of the anterior communicating artery aneurysm suffered by the plaintiff on February 26, 2002 was the result of an injury by accident arising out of and in the course and scope of plaintiff's employment. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's average weekly wage of $651.35 engenders a weekly compensation rate of $429.89. N.C. Gen. Stat. § 97-2(5).
3. As a result of his compensable injury by accident plaintiff was temporarily totally disabled and is entitled to compensation at the rate of $429.89 per week from February 26, 2002 to June 2002 and from February 28, 2003 and continuing until such time as Plaintiff returns to work or further order of the Commission. N.C. Gen. Stat. § 97-29.
4. From June 2002 until February 28, 2003 plaintiff was only able to work part-time and is entitled to temporary partial disability benefits at a rate of two-thirds the difference between his preinjury wage and the wages he earned in a part-time capacity. N.C. Gen. Stat. § 97-30.
5. Plaintiff is entitled to have defendant provide and pay for all reasonably necessary medical treatment arising from plaintiff's compensable injury to the extent it tends to effect a cure, give relief or lessen the period of Plaintiff's disability N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned makes the following:
 AWARD
1. Subject to attorney's fees approved below defendant shall pay plaintiff temporary total disability compensation at the rate of $429.89 per week from February 26, 2002 to June 2002 and from February 28, 2003 and continuing until such time as plaintiff returns to work or further order of the Commission.
2. Subject to attorney's fees approved below defendant shall pay plaintiff temporary partial disability benefits for the period from June 2002 until February 28, 2003 at a rate of two-thirds the difference between his preinjury wage and the wages he earned in a part-time capacity.
3. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of his compensable injury for so long as such examinations, evaluations, and treatments may reasonably be required to effect a cure, give relief, or lessen plaintiff's disability.
3. Plaintiff's counsel is entitled to a reasonable attorney's fee of 25% of the compensation awarded herein to plaintiff. To the extent that it has accrued in a lump sum, one-fourth of this amount shall be deducted and paid directly to plaintiff's counsel. Thereafter, every fourth check shall be sent directly to plaintiff's counsel.
4. The issue of plaintiff's permanent partial disability shall remain open.
5. Defendant shall bear the costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/____________________ THOMAS JEFFERSON BOLCH COMMISSIONER